Joseph A. BRODERICK, Plaintiff,

v.

CATHOLIC UNIVERSITY OF AMERICA, Defendant.

David J. K. GRANFIELD, Plaintiff,

v.

CATHOLIC UNIVERSITY OF AMERICA, Defendant.

Civ. A. Nos. 1534–71, 1535–71.

United States District Court, District of Columbia.

Oct. 17, 1973.

William R. Joyce, Jr., Washington, D. C., Vincent Broderick, New York City, admitted pro hac vice, for plaintiff Broderick.

Benjamin P. Lamberton, Washington, D. C., for plaintiff Granfield.

Stephen A. Trimble, Richard W. Turner, and Nicholas D. Ward, Washington, D. C., for defendant Catholic University.

## MEMORANDUM

GASCH, District Judge.

This is a consolidated civil action brought by two priests against the Catholic University of America where they are both employed as professors in the Columbus School of Law. The central issue revolves around the policy of the defendant University in paying clerical members of their faculty a lesser salary than that of lay faculty. Based upon numerous theories of law, each plaintiff seeks, essentially, to have the Court end this "clerical discount" as applied to them. Before reaching the plaintiffs' factual and legal claims, the Court will set forth the factual background in which this controversy arose.

### I. Factual Background.

The Catholic University of America until recently was a pontifical university functioning under the direction of the Holy See.[1] However, between 1967–1970 all but three schools of the defendant University have become independent of the Holy See.[2] Thus, but for a few remaining vestiges of its past governance by the Catholic hierarchy,[3] the Catholic University functions essentially as most other American institutions of higher education. Nevertheless, one of the remaining practices is the utilization of a "clerical scale" which in application allows those members of the faculty who are clergy or religious a lower salary than lay faculty members. At the present time there are only two members of the law school faculty who are clerics and to whom this "scale" is applicable. These two faculty members, Father Joseph Broderick and Father David J. K. Granfield, are the plaintiffs in this case. Both plaintiffs have received tenure.

It appears clear from the testimony and exhibits that the elimination of parity has been an issue which has received varying degrees of consideration over the years. As early as 1945, at a meeting of the executive committee of defendant's Board of Trustees, a revised faculty scale was proposed which would, within four years and when fully implemented, put clerical and religious members of defendant's faculty on a basis of salary parity with lay members of its faculty. The revised scale was adopted and put into effect for lay members of the faculty, but not for clerical and religious members.[4] This pattern of indeci-

1. Prior to 1968, the selection of the University president was subject to the approval of the Vatican and all members of the Board of Trustees were members of the hierarchy of the Catholic Church. Transcript at 108–112 (all references to the trial transcript will hereinafter be denoted by a capital T).

2. The three schools still remaining under pontifical direction are the schools of Theology, Philosophy, and Canon Law. Plaintiff Broderick's Proposed Findings of Fact number 29.

3. One half of the Board of Trustees are clerics, of which five are Cardinals. There are in addition other strong ties to the Roman Catholic Church within the structure of the University, but these are extraneous for the most part to the question at issue.

4. Exhibit 4d—Minutes of the Board of Trustees, January 12, 1945. In addition, the executive committee of the Board of Trustees considered a petition that parity be extended for the clerical and religious faculty in January of 1965 with only an adoption of a 20% increase for the clerics and religious faculty resulting. Exhibit 4f—Minutes of the Board of Trustees, April 28, 1965. Again in 1966 a committee was appointed to study a request for salary increases for the priest-professors of up to 70% of parity. Exhibit 4h—Minutes of the Board of Trustees, November 13, 1966.

sion and movement in regard to parity resulted in several statements and announcements, and resolutions over the years which are critical to plaintiffs' claims in this case.

First, on February 8, 1968, the defendant's Academic Senate [5] adopted a resolution that the Academic Senate request defendant's Board of Trustees to adopt a policy of parity of salaries between clerical and religious members and lay members of defendant's faculty and to "implement this policy *without delay*." [6] (Emphasis added).

Subsequently, on September 12, 1968, Mr. Hickey of the Finance Committee of the Board of Trustees reported that his committee "*favored* putting the salaries of clerical members of the faculty on a parity with lay members." [7] (Emphasis added). Similarly, on December 6–7, 1968, the Finance Committee and the Academic Affairs Committee both wished

> to go on record as still considering the *desired goal* (emphasis added) in faculty salaries to be the A level of the AAUP [American Association of University Professors] scale—not *Plan A* —including, eventually, placing the salaries of clerical members of the faculty on a parity with lay teachers.
>
> The Committees, however, faced the straitened 1969–70 financial situation. Its realities make it impossible to implement Plan B as submitted by the Academic Senate. [8]

The Committees at this meeting recommended that the present salary scale be kept, and the sums available be used for new personnel and merit increments for members of the faculty. These recommendations were approved. [9]

Following this December 6–7, 1968, meeting of the Board of Trustees, there were many interpretations of exactly what the Board of Trustees had accepted as a matter of policy. The *Administrative Bulletin* of December 16, 1968, a publication emanating from the Office of the Provost and a general source of information to the University community, reported that

> after consideration of faculty salary proposals presented at a previous meeting, the Board (1) affirmed acceptance *as a goal* of the A–level standard of the American Association of University Professors and elimination of the present disparity between scales for clerical and religious and lay members of the faculty; (2) directed that normal salary increments under the present scale should be continued during 1969–70; and (3) directed that after such increments, funds remaining from increased tuition income should be used for salaries of new administrative and faculty personnel and for merit increments to present members of the faculty. [10] (Emphasis added).

This interpretation of the Board of Trustees' action appears to follow accurately the minutes of the Board of Trustees December 6–7, 1968, meeting. However, Acting President Nivard Scheel at a December 12, 1968, meeting of the Academic Senate reported that the Board of Trustees, with respect to faculty salaries,

> approved a recommendation submitted jointly by its Committees on Academic

---

5. The Academic Senate is a body composed of members of the administration, including the president, vice-president, and deans in addition to the representatives chosen by the faculty of the various schools and departments. The Senate shares with the president the responsibility for the *academic* governance of the University. T at 26–27. It is significant that the direction and management of affairs of the University are controlled by the Board of Trustees, Exhibit 12, Documents of the Catholic University of America at 2.

6. Exhibit 5a, Minutes of the Academic Senate, February 8, 1968.

7. Exhibit 4l, Minutes of the Board of Trustees, September 12, 1968.

8. Exhibit 4m, Minutes of the Board of Trustees, December 6–7, 1968.

9. *Id.*

10. Exhibit 6a, *Administrative Bulletin*, December 16, 1968.

Affairs that the AAUP "A" scale, and parity of clerical and lay salaries be achieved *as soon as possible*. However, because of limited revenues, "Plan B" cannot be achieved next year. Income from the rise in tuition will therefore be used to a) maintain present salary scale, b) permit recruitment of new administrative and faculty personnel, and c) allow for merit increases to selected members of the faculty.[11]

From the foregoing facts plaintiffs argue that the University community and even the administration believed that "defendant's board of trustees had accepted the principle of parity of salaries" although admittedly there were questions with respect to the "speed of implementation of the *goal* which the administration announced had been adopted."[12] (Emphasis added). In further support of this argument, plaintiffs both point out the meeting of President Walton with the priest-faculty members at Curley Hall. At this meeting, as reported the Board of Trustees by President Walton, the priest-professors were told by President Walton that

the University *aims* to raise their salaries to parity: to 75% of parity in 1971–72; 85% in 1972–73; and 100% in 1973–74. To do this, [President Walton] said, will increase the University's financial problems by some $300,000 as against the $80,000 deficit Curley Hall dining hall shows annually.[13] (Emphasis added).

II.   Promissory Estoppel.

Within this factual context, the strongest of both plaintiffs' arguments

appears to be that the defendant, on the grounds of promissory estoppel, should be estopped from denying that both plaintiffs had been removed from the clerical scale due to representations made by the defendant through its administrators and Board of Trustees and justifiably and detrimentally relied upon by plaintiffs. Since plaintiff Broderick has an additional basis for his promissory estoppel arguments, his contentions will be dealt with after those of Father Granfield.

A.   Father Granfield.

Father Granfield is a professor of law at defendant Columbus School of Law where he has been on the faculty since 1960.[14] As noted previously, Father Granfield is paid on the "clerical scale" which results in his salary being approximately 50 percent of the median salary paid to other full professors at the Law School.[15]

Father Granfield's promissory estoppel argument is based upon the representations made by the administration, especially that of Acting President Nivard Scheel that parity would be achieved "as soon as possible," and the actions and announcements of the Board of Trustees.[16]

The Restatement of Contracts, § 90, most succinctly sets forth the elements of promissory estoppel:

A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action

---

11. Exhibit 5b, Minutes of the Academic Senate, December 12, 1968.

12. Proposed Findings of Fact of Plaintiff Broderick, numbers 83, 84. Additionally, with respect to the implementation of parity, Provost Nuesse, in rejecting Father Broderick's request for a full salary during his sabbatical leave in 1969–70, stated:

. . . I *hope* that the dual scale of salaries can be eliminated within the next year or two so that this kind of problem will not recur. (Emphasis added).

Exhibit 10bb, Letter of Provost Nuesse to Acting Dean Rohner, June 16, 1969.

13. Exhibit 4n, Minutes of the Board of Trustees, June 6, 1970.

14. Father Granfield graduated from Harvard University Law School in 1947 and has published a casebook and numerous legal articles.

15. T at 342.

16. See *supra*, note 11, and notes 4, 6, 7, 8, 9, and 10 and accompanying text.

or forbearance is binding if injustice can be avoided only by enforcement of the promise.[17]

■■ The Court considers the statements issued by the University as to parity were often confusing and possibly contradictory. Nevertheless, upon careful review of these pronouncements, this Court cannot find that Father Granfield could have justifiably relied upon these statements. Comment b of § 90 of the Restatement addresses this point by noting:

> The promisor is affected only by reliance which he does or should foresee, and enforcement must be necessary to avoid injustice. Satisfaction of the latter requirement may depend on the reasonableness of the promisee's reliance, on its definite and substantial character in relation to the remedy sought, on the formality with which the promise is made, on the extent to which evidentiary, cautionary, deterrent, and channeling functions of form are met by the commercial setting or otherwise, and on the extent to which such other policies as enforcement of bargains and the prevention of unjust enrichment are relevant.[18]

In the factual setting previously set forth, it is clear that Father Granfield's reliance in the context of promissory estoppel on amorphous statements that included such wording as "desired goal",[19] "as a goal",[20] and "as soon as possible",[21] was not justified. The most definite statement emanated from President Walton where he set forth the specific intentions of the University.[22] Again, however, President Walton spoke only of intentions and in light of the stance of the Board of Trustees and the past precatory wording of all statements concerning parity, this Court concludes that Father Granfield's promissory estoppel claim must fail when viewed under the scrutiny of all the surrounding circumstances.[23]

## B. Father Broderick.

Father Joseph Broderick, a priest in the Dominican Order of Preachers, is a tenured professor of law and, like Father Granfield, is a well-respected member of the Law School faculty.[24] Although Father Broderick bases his promissory estoppel claim on many of the same grounds as Father Granfield, Father Broderick has an additional basis which involves a very difficult and, in a factual sense, very different question. To the extent that Father Broderick's promissory estoppel claims are grounded on the same principles as those of Father Granfield, they must be rejected on the findings and conclusions previously

---

17. The Restatement Second of Contracts (Tent.Draft #2) sets out Section 90 as follows:

A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee, or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

See generally 1 Williston, Contracts §§ 139–140 (3d ed. 1957). Union Mutual Life Insurance Co. v. Mowry, 96 U.S. 544, 24 L.Ed. 674 (1877).

18. See Curtiss Candy Co. v. Silberman, 45 F.2d 451, 453 (6th Cir. 1930). 1 Williston, Contracts § 140 (3d ed. 1957).

19. See *supra*, note 8 and accompanying text.

20. See *supra*, note 10 and accompanying text.

21. See *supra*, note 11 and accompanying text.

22. See note 13 *supra*, and accompanying text.

23. Moreover, this Court fails to find any real reliance by Father Granfield. The fact that plaintiff Granfield was "approached" by Professor Katz of the Boston College of Law does not illustrate to this Court from the information presented that there was either a preliminary offer for Father Granfield to take employment elsewhere or that Father Granfield did not leave Catholic University because of his reliance on a "promise" of parity from defendant. See Goodman v. Dicker, 83 U.S.App.D.C. 353, 169 F.2d 684 (1948), *cf.* Dickerson v. Colgrove, 100 U.S. 578, 580, 25 L.Ed. 618 (1879).

24. Father Broderick received his A.B. degree from Princeton University and an LL.B. degree from Harvard University. After ordination, Father Broderick received an S.J.D. degree from Harvard and a doctoral degree from Oxford University.

outlined. In regard to Father Broderick's additional claim, the facts are as follows.

. Between January 25 and April 24, 1970, Father Broderick and Clinton Bamberger, Dean of the Law School, corresponded with one another concerning plaintiff Broderick's request for an increased salary. It is evident that Father Broderick was contemplating resignation if his *salary* was not increased for the school year 1970–71.[25] In response to Father Broderick's request for a salary increase, Dean Bamberger wrote:

> $11,000 is the maximum paid to University clerics under University policy. If I was not bound by that policy I would have recommended for you a salary of $21,500. That is the step at which you would be in the scale which I constructed to give me some rough guidance.[26]

The critical letter upon which Father Broderick bases his promissory estoppel and contract claims is the letter of April 24, 1970, from Dean Bamberger to Father Broderick. This letter reads in relevant part:

> . . . I have just firmed up your salary for next year and want to get the news to you as soon as possible. The *salary* for *next year* for you will be $20,100—*with no clerical discount.*[27] (Emphasis added).

■ Plaintiff Broderick's argument is that he returned to Catholic University to teach in reliance upon this salary increase which he interpreted as an agreement to grant parity by defendant.[28] Father Broderick has argued that the April 24, 1970, letter which spoke of $20,100 with "no clerical discount" is subject to two interpretations and he interpreted it as a grant of parity. However, it is the opinion of this Court in view of the surrounding circumstances and the past history of the parity issue at the defendant University, that the April 24 letter was referring only to a salary increase, not a change of status removing Father Broderick from the clerical scale.

In addition, the Court finds that Father Broderick could not have justifiably relied[29] on this letter as a basis for believing he had been granted parity. Father Broderick was informed on January 29, 1970, that his salary would be $21,500, not $20,100 if he was to be removed from the "clerical scale." Furthermore, the Provost, Dr. Nuesse, has testified that it was his view that only an exception had been granted to Father Broderick and not his placement on the lay scale.[30] This appears to be the correct interpretation of the April 24 letter. Thus, the language "no clerical discount," as noted previously, applied only to plaintiff Broderick's salary, not his status. In his letter to Dean Bamberger of January 25, 1970, it is also noteworthy that Father Broderick was waiting for final word "as to what my salary for 1970–71" will be,[31] not whether he would be placed on the lay scale. The Court concludes, therefore, that Father Brod-

---

25. Exhibit 10d, Letter of Father Broderick to Dean Bamberger, January 25, 1970. In this letter Father Broderick informed Dean Bamberger:

> I will not submit a resignation herewith. But I will promise you an immediate response when I receive final word from you as to what my *salary* for 1970–71 is finally determined to be (emphasis added).

26. Exhibit 10g, Letter from Dean Bamberger to Father Broderick, January 29, 1970.

27. Exhibit 10a, Letter from Dean Bamberger to Father Broderick, April 24, 1970.

28. T at 73. Without deciding the question whether Dean Bamberger or Provost Nuesse had the power to grant Father Broderick's request to be removed from the clerical scale, it appears to the Court that the Dean traditionally acted as the representative of the faculty member in contract negotiations not as the spokesman for the defendant's view. Moreover, Dr. Nuesse testified that even he did not have the authority to remove a priest-professor from the clerical scale. T at 538–39.

29. See *supra* note 18 and accompanying text.

30. T at 269, 524–525.

31. See *supra* note 25.

**154**

erick's promissory estoppel claim must be rejected for the reasons stated.

### III. Contract.

The contract claims of each plaintiff are based on essentially the same fact patterns as the promissory estoppel arguments. However, it is alleged that the breach of the contract to grant parity, which arose from all the statements of the administration and the Board of Trustees, occurred on ·December 12, 1970, when the Board of Trustees passed a resolution basically reaffirming the principle of the clerical scale.[32]

■ Without reviewing each pronouncement and each letter once more, it is the holding of the Court that no contract to grant parity ever arose between plaintiffs and defendant. Due to the ambiguous nature of the announcements, resolutions, and letters, it can only be held that there was no meeting of the minds of the parties and no real agreement demonstrating offer and acceptance ever in fact existed. 1 Williston, Contracts §§ 17–21 (3d ed. 1957); Zell v. American Seating Co., 138 F.2d 641, 646 (2d Cir. 1943). Moreover, from the facts before the Court it is clear that there was only a "mere expression of intention" on the part of the defendant that did not amount to an offer that could in any manner be accepted by plaintiffs. 1 Williston, Contracts § 26 (3d ed. 1957). In the language of Justice Holmes:

> On the face of it, it does not import a legally binding promise, but rather a hopeful encouragement, sounding only in prophecy.

Hall v. First National Bank of Chelsea, 173 Mass. 16, 53 N.E. 154, 155 (1899).

### IV. Constitutional Claims:

■ Both plaintiffs assert numerous constitutional claims asserting a violation of the First and Fifth Amendments of the Constitution. Essentially, plaintiffs argue that due to the United States Government's involvement in the defendant, through tuition grants, research and instruction grants, Congressional chartering, and defendant's tax exemption as an educational institution, there is sufficient governmental involvement ("state action") to bring into play the clauses of the Bill of Rights which limit the impingement by governmental action upon individual rights. The Court does not agree.

■ In regard to the amount of federal funds flowing to the University, it is clear that without further direct involvement in the affairs of the defendant, no governmental action exists. In the case of Grossner v. Trustees of Columbia University, 287 F.Supp. 535 (S. D.N.Y.1968), the District Court was met with very similar claims of violations of constitutional rights by Columbia University's disciplinary proceedings against students involved in building depredations. Although the case addressed principally the use of state funds[33] by Columbia University, the language is clearly analogous to the issue presented to this Court. In deciding this point, the Grossner Court stated:

> A more fundamental point against plaintiffs is that receipt of money from the State is not, without a good deal more, enough to make the recipient an agency or instrumentality of the Government. Otherwise, all kinds of contractors and enterprises, increasingly dependent upon government

---

32. This resolution, Exhibit 4p, December 14, 1970, was the subject of much controversy due to its ambiguous wording but was finally interpreted by a special Ad Hoc Committee of the Academic Senate to be a repudiation of parity.

33. In 1966, $49,500,000 out of the $117,500,-000 income of Columbia University came from

public funds. Similarly, in 1967, $59,700,000 of a total of $134,300,000 came from public funds. In our case the defendant in the fiscal year ending 1968 received 24.9 percent of all its income from the Federal Government. In the fiscal year of 1970 defendant received 25.8 percent of its income from the United States Government and 24.6 percent in fiscal 1971.

business for much larger proportions of income than those here in question, would find themselves charged with "state action" in the performance of all kinds of functions we still consider and treat as essentially "private" for all presently relevant purposes. See Simkins v. Moses H. Cone Memorial Hospital, 323 F.2d 959 (4th Cir. 1963), cert. denied, 376 U.S. 938, 84 S.Ct. 793, 11 L.Ed.2d 659 (1964).

287 F.Supp. at 547–548.

*Grossner*, additionally, noted that the test of Burton v. Wilmington Parking Authority, 365 U.S. 715, 725, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), was how far the state "insinuated itself into a position of interdependence . . . that it must be recognized as a joint participant in the challenged activity." 365 U.S. at 725, 81 S.Ct. at 862.

It is apparent to this Court that the Federal Government has in no substantial respect insinuated itself into any form of interdependence with Catholic University. Although money and tax considerations are given to defendant, this is a far cry from any influence on policy or decision-making or the encouragement of any specific policy. Therefore, as to whether there is "governmental action" due to the influx of Federal funds, the Court finds there is not.

The plaintiffs' arguments in relation to tax exemptions and government chartering and government action are equally without merit. The Sixth Circuit recently was confronted with a similar issue in Blackburn v. Fisk University, 443 F.2d 121 (1971). The plaintiffs were students at the University and were suspended without a hearing. Fisk University is a privately endowed university under a charter granted by the State of Tennessee and exempt from state and local taxes. The court, in rejecting plaintiffs' allegation that university action was tantamount to "state action," held:

State involvement sufficient to transform a "private" university into a "State" university requires more than

merely chartering the university, Trustees of Dartmouth College v. Woodward, 17 U.S. (4 Wheat.) 518 [4 L.Ed. 629] . . ., providing financial aid in the form of public funds, Grossner v. Trustees of Columbia University, 287 F.Supp. 535 (S.D. N.Y.); or granting of tax exemptions, Browns v. Mitchell, 409 F.2d 593 (10th Cir.).

443 F.2d at 123.

Thus, plaintiffs' allegations of "governmental action" must be rejected. Since there is no governmental action, the constitutional claims of plaintiffs need not be specifically discussed.

In conclusion, all other claims of plaintiffs have been found to be without sufficient substance to warrant detailed analysis. Although the Court has respect and sympathy for the sincerity and depth of plaintiffs' feelings regarding parity, we are unable to find a legal basis for ruling that plaintiffs are entitled to parity of salaries on the facts presented under the circumstances of this case.